USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/10/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

YOSEMITE INSURANCE CO.,

                              Petitioner,

          -v-

NATIONWIDE MUTUAL INSURANCE CO.,

                              Respondent.

------------------------------------------------------------X

16 Civ. 5290 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

      This case involves competing petitions by insurance companies with regard to an arbitral award ("Award"). Petitioner Yosemite Insurance Co. ("Yosemite") seeks to vacate the Award, Dkt. 1-1 at 4-10 ("Petition" or "Pet."), and Nationwide Mutual Insurance Co. ("Nationwide") brings a cross-petition to confirm it, Dkt. 13 ("Cross-Petition"), while also seeking fees and costs incurred in opposing Yosemite's challenge, which Nationwide argues is frivolous, *id.* at 8.

      The Award resolved a dispute that arose when Yosemite, an insurer for the State of California, sought recovery from Nationwide, a re-insurer subject to a re-insurance contract (the "Treaty"), of a portion of a settlement with California over pollution losses. Nationwide refused to pay Yosemite's bill. By a 2-1 vote, the arbitral panel held that Yosemite's claim was excluded under the Treaty, such that Nationwide was not required to pay Yosemite.

      Yosemite's petition to vacate presents a somewhat closer question than many challenges to arbitral awards. That is because, while one of Yosemite's challenges to the Award (based on an arbitrator's alleged partiality) is meritless, its separate claim that the panel incorrectly interpreted a Treaty provision has some force. But Yosemite's bid for vacatur on that theory, as

explained below, would require the Court to exceed the limited scope of judicial review of an arbitral decision. The Court accordingly denies Yosemite's petition, and grants Nationwide's petition to confirm. The Court, however, denies Nationwide's motion for fees and costs.

## I.     Background

### A.     Factual Background[1]

#### 1.     The Underlying Dispute and Relevant Treaty Provisions

In 1955, a geologist for the State of California erroneously determined that a Riverside County, California, quarry was suitable to serve as a location for the disposal of industrial waste. Mulloy Aff., Ex. 5, at 3. In 1956, California opened a waste disposal facility on the site. *Id.* Due to undetected geological flaws, the facility spewed pollutants into the surrounding area. *Id.* In 1972, on discovering the contamination, California closed the facility. *Id.* In 1998, a federal court found California 100% liable for past and future remediation costs resulting from the pollution—an estimated $700 million. *Id.* at 4.

On August 16, 2013, California obtained a $7.5 million settlement from Yosemite, one of its insurers. *Id.* Decades earlier, Yosemite had entered into the Treaty—the "Third Umbrella Liability Excess of Loss Reinsurance Contract"—with Nationwide, under which Nationwide became one of Yosemite's reinsurers. Nat. Mem. at 6; Treaty at 1. After the settlement,

---

[1] The Court draws these facts principally from the Treaty, Dkt. 15, Ex. 1, the Award, Dkt. 15, Ex. 2, Yosemite's Petition, Nationwide's memorandum of law in opposition to the Petition and in support of the Cross-Petition, Dkt. 14 ("Nat. Mem."), and the other exhibits attached to the affidavit of Melissa M. Mulloy in support of Nationwide's opposition to the Petition and in support of the Cross-Petition, Dkt. 15 ("Mulloy Aff.").

2

Yosemite sought, under the Treaty, recovery from Nationwide of a 6% share (or $330,000) of the settlement amount. Award at 1.

Nationwide refused to pay. It relied on Article II(1)(B) of the Treaty. That article lists 19 types of business activity or claims, and provides that "[t]his contract does not apply to but specifically excludes" them. Among these exclusions is one for "contamination and pollution." *See* Article II(1)(B)(11).[2]

Yosemite responded that Article II(1)(C) of the Treaty creates an exception to all Article II(B) exclusions. Mulloy Aff., Ex. 7, at 2 ("Arb. Tr.") Article II(1)(C) states,

> If the insured's main operations are not excluded hereunder, exclusions listed in paragraph B above shall not apply, provided such operations or perils are incidental to the insured's main operations. The reinsured shall be the sole judge of the meaning of the word "incidental."

Treaty at 2. Yosemite read Article II(1)(C) to mean that an Article II(1)(B) exclusion, such as that for contamination and pollution, would apply only if the operations thereby excluded were the insured's main operations. Arb. Tr. at 2. Under that reading, Yosemite argued, the Treaty would allow it to recover against Nationwide because California's "main operations" were not covered by the activities listed in Article II(1)(B).[3]

When Yosemite and Nationwide could not resolve the dispute, Yosemite demanded arbitration. Nat. Mem. at 7.

---

[2] Other exclusions are for, *inter alia*, "manufacturing, processing, distribution, storage or handling of explosive substances (i.e., substances having the express purpose of exploding)"; "products recall"; "public carriers on rails"; "drilling of oil and gas wells and the refining of petroleum"; "directors and officers liability"; "securities and exchange commission liability"; "fidelity and surety"; "gas and electric utilities"; and "ship building and ship repair liability except as respects vessels up to eighteen (18) tons." *See* Article II(1)(B).

[3] As to the term "incidental" in Article II(1)(C), Yosemite argued that any contamination and pollution by California is incidental to its "main operations" as a state. And, Yosemite argued, even if there was ambiguity on that point, under that provision, the determination whether such

3

### 2.    The Selection of Arbitrators

Article XVIII of the Treaty requires the parties to arbitrate any dispute arising under it. *See* Treaty at 7. The arbitral panel must consist of three members, two party-appointed and the third selected either by agreement of the parties or alternatively by a ranking and striking selection process provided by the American Arbitration Association ("AAA"). *Id.* The arbitration must take place in San Francisco, unless the parties agree on another location, and a decision made by a panel majority is binding. *Id.* at 8.

In this case, as required by the Treaty, Yosemite and Nationwide each named a party-appointed arbitrator. When the parties could not agree on a neutral arbitrator, the AAA's ranking and striking process led to the selection of Fritz Huszagh as the third arbitrator. Pet. at 4.

### 3.    Arbitrator Huszagh's Disclosures

The AAA gave both parties Huszagh's answers to a disclosure questionnaire and gave the parties an opportunity to object. Nat. Mem. at 7. Neither party did so. *Id.*

On October 15, 2015, the parties met for the first time with the arbitral panel and the arbitrators made further disclosures. *Id.* Huszagh disclosed that (1) before law school, while working at an insurance company, he had hired the predecessor law firm of the one at which Yosemite's counsel worked; (2) while serving as an arbitrator, he had presided over a matter in which Yosemite's counsel, then representing a different client, had appeared; and (3) he had unsuccessfully attempted, years ago, to be retained by Yosemite. *Id.*[4] Huszagh reported that, to

---

activities were incidental was for Yosemite, unilaterally, to make, and Nationwide was obliged to accept Yosemite's determination if made in good faith. Award at 2.

[4] It is unclear whether Huszagh was referring to an attempt to be retained as a lawyer or as a party-appointed arbitrator.

4

his recollection, he had "never represented or even been against either Yosemite or Nationwide Insurance Company." *Id.*

Huszagh also disclosed at the meeting that Yosemite representative Robert L. McDonnell had informed him that they knew each other. *Id.* Huszagh said that he did not recall McDonnell. *Id.* McDonnell then identified a few occasions on which he recalled meeting Huszagh. *Id.* Huszagh then invited questions. *Id.* Neither side asked any, and the parties accepted the panel. *Id.* at 8.

Relevant here, Huszagh did not disclose that, in a 2004 arbitration between Allstate Insurance Company ("Allstate") and Yosemite ("the Allstate Proceeding") that appears to have settled prior to a plenary hearing, he had served as Allstate's counsel. Pet. at 4. Huszagh's role in that proceeding came to light only after the arbitration in this case was over. It came to light as a result of a review of documents in a separate arbitration, also involving Yosemite and Nationwide. McDonnell, who had represented Yosemite in the Allstate Proceeding, also did not recall, or disclose, the Allstate Proceeding before or during the arbitration in this case, including at the October 15, 2015 meeting. Nat. Mem. at 7.

### 4. The Arbitration Hearing

The arbitration was held on February 8, 2016.

Relevant here, at the arbitration hearing, arbitrator Huszagh questioned Yosemite's reading of Article II(1)(C). Describing the provision as "very difficult," Huszagh suggested that the reference there to "exclusions hereunder" might refer not to the 19 exclusions listed in Article II(1)(B), as Yosemite argued, but to the two Articles immediately following Articles II(1)(C), *i.e.*, Articles (II)(1)(D) and (II)(1)(E). (Those provisions refer to, respectively, circumstances involving inadvertent binding of Yosemite and business "specially accepted" by Nationwide.) Arb. Tr. at 10–11. Under the alternative reading posited by Huszagh, the Article

5

II(1)(B) exclusions would apply even where the excluded operations had not been the insured's main operations. On that reading, in the California dispute at hand, Nationwide could invoke the Article II(1)(B) exclusion to avoid coverage. In support of this construction, Huszagh noted that "the next phrase" in Article II(1)(C) refers to "exclusions listed in Paragraph B above." Because the Treaty "use[s] the word[s] 'hereunder and above' in the same sentence," Huszagh suggested, as a matter of construction, the use of term "hereunder" alone in Article II(1)(C) implied that it did not include the clauses above in Article II(1)(B). As Huszagh put the point: "[I]f hereunder means things above it, then what does the word 'above' refer to?" *Id.*

Although Nationwide had not previously made precisely that argument, relying instead on other aspects of construction that yielded that same result, it embraced Huszagh's proposed construction later in the hearing. Nationwide's counsel argued: "I think you have got a viable argument on 'hereunder,' what that's supposed to mean. Is that only intended to apply to special acceptances below [in Article II(1)(E)] or is it intended to apply to . . . all the exceptions above B." *Id.* at 24. Nationwide asserted that, among various constructions of Article II(1)(C) that excluded coverage, one was "[Huszagh's] view of the use of the word 'hereunder,' if you say it only applies to special acceptances." *Id.* at 124.

Nationwide separately argued that contamination and pollination were not incidental to California's main operations. Therefore, it argued, Article II(1)(C) did not impose liability on it, regardless how the term "hereunder" was construed. *Id.*

     5.    **Arbitration Award**

By a 2-1 vote, with Huszagh in the majority, the panel found for Nationwide and dismissed the matter with prejudice. The panel did not award fees or costs. Award at 3–4.

The panel majority stated that its outcome turned on its construction of the "imprecise[e]" word "hereunder" as used in Article II(1)(C). *Id.* at 2. The majority noted that the Treaty used

6

"hereunder" inconsistently, sometimes referring to the whole Treaty and sometimes to a distinct provision in it. *Id.* The majority viewed Yosemite as reading "hereunder" in Article II(1)(C) to refer to the entire Treaty, including Article II(1)(B), and Nationwide as reading "hereunder" there to refer only to the provisions following Article II(1)(C). The majority acknowledged, however, that Nationwide, initially, had "not ma[d]e the argument quite this way." *Id.*

Adopting Nationwide's argument, the majority stated that the Article II(1)(B) exclusions "must mean something, given the breadth and detail of that list." It declined to interpret Article II(1)(C) to state that "virtually any insured whose main operations are not explicitly delineated in the [Article II(1)(B)] list would be subject to reinsurance." *Id.* at 3. Instead, the majority held that "hereunder" referred to Articles II(1)(D) and II(1)(E)—*i.e.*, the articles beneath the disputed provision. *Id.* Therefore, it held, "reinsurance for liability pertaining to contamination and pollution would only be available if the policy sold to the State of California by Yosemite" fell within one of those two provisions—that is, that it had been "inadvertently bound pursuant to II(1)(D)" or "specially accepted under II(1)(E)." *Id.* Because Yosemite had not argued that it other those two provisions applied, Yosemite was not entitled to recovery from Nationwide. *Id.*

### B. Petition for Vacatur

On June 6, 2016, Yosemite filed suit in New York state court, seeking to vacate the arbitral award. On July 5, 2016, Nationwide removed the action to federal court, based on the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq. See* Dkt. 5. Yosemite did not challenge the removal.

On August 25, 2016, Nationwide filed its answer and Cross-Petition, Dkt. 13, and a memorandum of law, Dkt. 14. On September 15, 2016, Yosemite filed a reply. Dkt. 20. On September 22, 2016, Nationwide filed a reply. Dkt. 23.

On October 18, 2016, the Court heard argument.

7

**II.    Discussion**

Yosemite seeks to vacate the Award on two grounds: that (1) the Award was "irrational," and (2) arbitrator Huszagh did not disclose "material information," which created an "impression of bias." Pet. at 2.

In bringing these challenges, Yosemite faces an imposing standard of review under the FAA, which Yosemite—despite having briefed this case based on New York law—conceded at argument governs this case.[5] Under the FAA, while a district court "can confirm and/or vacate the award, either in whole or in part," *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006), judicial review of arbitral awards is "severely limited, so as not to frustrate the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation," *Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71–72 (2d Cir. 2012) (internal quotation marks and citations omitted). A reviewing court owes "strong deference" to "arbitral awards and the arbitral process," *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 138 (2d Cir. 2007), and so a party seeking to vacate an arbitral award "must clear a high hurdle," *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662, 671 (2010).

For the reasons that follow, Yosemite's challenges to the Award lack merit.

---

[5] "The FAA governs—to the exclusion of state law—whenever the matter involved is a maritime transaction or one involving interstate or foreign commerce." *United House of Prayer for All People of Church on the Rock of Apostolic Faith v. L.M.A. Int'l, Ltd.*, 107 F. Supp. 2d 227, 230 (S.D.N.Y. 2000). The reinsurance contract at issue here involves interstate commerce. *see Utica Mut. Ins. Co. v. Gulf Ins. Co.*, 306 A.D.2d 877, 878 (2003) (reinsurance contract involved "interstate and, indeed, international commerce" when it involved diverse contracting parties and "claims that could arise anywhere in the world"). The choice between the FAA ad New York law is not, however, determinative here. The Court would reach the same outcome under New York law.

8

## A.     Irrationality

The Court turns first to Yosemite's substantive challenge, which Yosemite has framed as a challenge to the Award's rationality.

Section 10(a)(4) of the FAA permits vacatur "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). To meet the requirements of § 10(a)(4), "[i]t is not enough for petitioners to show that the panel committed an error—or even a serious error." *Id.* Rather, "[i]f there is 'even a barely colorable justification for the outcome reached,' the court must confirm the arbitration award." *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 13 (2d Cir. 1997) (quoting *Matter of Andros Compania Maritima, S.A.*, 579 F.2d 691, 704 (2d Cir. 1978)).

In the specific context of a contract dispute, § 10(a)(4) permits vacatur "only when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice." *Stolt-Nielsen*, 559 U.S. at 671 (alterations, citations, and internal quotation marks omitted). Courts "are required to confirm arbitration awards despite serious reservations about the soundness of the arbitrator's reading of the contract," as "[w]hether the arbitrators misconstrued a contract is not open to judicial review." *Stolt-Nielsen*, 548 F.3d at 92 (alteration and internal quotation marks omitted); *see Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2071 (2013) ("The arbitrator's construction holds, however good, bad, or ugly.").

In addition to § 10(a)(4), the Second Circuit also permits vacatur where an award "exhibits a manifest disregard of the law." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 91 (2d Cir. 2008), *rev'd and remanded on other grounds*, 559 U.S. 662 (2010) (internal quotation marks omitted). The manifest disregard standard, rather than substantially broadening

the grounds for vacatur, largely operates "as a judicial gloss on the specific grounds for vacatur enumerated in section 10 of the FAA." *Id.* at 94–95. Vacatur for manifest disregard of the law "is a doctrine of last resort," reserved for "those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent but where none of the provisions of the FAA apply." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir. 2003). Manifest disregard of the law "means more than error or misunderstanding with respect to the law." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986). It applies where: (1) "the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators," (2) "the law was in fact improperly applied, leading to an erroneous outcome," and (3) "the arbitrator . . . kn[ew] of its existence, and its applicability to the problem before him." *Duferco*, 333 F.3d at 390.

In contract dispute cases specifically, the Second Circuit has "appl[ied] a notion of 'manifest disregard' to the terms of the agreement analogous to that employed in the context of manifest disregard of the law." *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 25 (2d Cir. 1997); *but see Stolt-Nielsen*, 548 F.3d at 91 (clarifying that the Second Circuit does not "recognize manifest disregard of the *evidence* as proper ground for vacating an arbitrator's award" (internal quotation marks omitted)). "[V]acatur for manifest disregard of a commercial contract is appropriate only if the arbitral award contradicts an express and unambiguous term of the contract or if the award so far departs from the terms of the agreement that it is not even arguably derived from the contract." *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 222 (2d Cir. 2002); *see Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 25 ("We will overturn an award where the arbitrator merely makes the right noises—noises of contract

10

interpretation—while ignoring the clear meaning of contract terms." (alteration and internal quotation marks omitted)).

Here, the Court understands Yosemite, in claiming that the Award was "irrational," to be seeking vacatur under either § 10(a)(4) or the manifest disregard doctrine. No other basis for vacatur is potentially applicable, and Yosemite does not direct the Court to any.

Yosemite's challenge on this ground, based on its argument that the arbitral panel too narrowly construed the "exclusions hereunder" clause in Article II(1)(C) so as not incoporate the exclusions in Article II(1)(B), is, however, beyond the scope of the Court's proper review. "[C]ontractual interpretation [is] not subject to judicial challenge." *Westerbeke*, 304 F.3d at 213. Judicial review instead "focuses on whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 824 (2d Cir. 1997); *see also Oxford Health Plans LLC*, 133 S. Ct. at 2068 ("[T]he sole question . . . is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong.").

The Court cannot say, upon a close examination of the arbitral panel's reasoning, that the panel "stray[ed] from interpretation and application of the agreement," *Stolt-Nielsen*, 559 U.S. at 671 (citation omitted), manifestly disregarded clear law or "clear meaning of contract terms," *Yusuf*, 126 F.3d at 25, "contradict[ed] an express and unambiguous term of the contract," or "so far depart[ed] from the terms of the agreement that [the Award] is not even arguably derived from the contract," *Westerbeke*, 304 F.3d at 222. Rather, as the Award makes plain, the panel anchored its reasoning in inferences drawn from the Treaty's text. Thus, the panel determined that the word "hereunder" as used in Article II(1)(C) was ambiguous, noting that the Treaty uses

that word inconsistently. Award at 2. The panel then reasoned that the "juxtaposition" of the word "above" in Article II(1)(C) suggested that the term "hereunder" as used there referred to something other than the preceding provision, Article II(1)(B. *Id.* at 3. The panel then studied the Article II(1)(B) exclusions and inferred from the "breadth and detail" of that list that the exclusions "must mean something," and that Nationwide's claim of exclusion based on the Article II(1)(B) exclusions was more persuasive than Yosemite's reading, under which Article II(1)(C) significantly restricted the applicability of those exclusions. *Id.*

The panel's reasoning, in short, was derived from, and drew its essence from, the text of the Treaty. It is therefore beyond the scope of judicial review. To be sure, based on its review, the Court acknowledges that there is force to Yosemite's construction. The panel could easily have construed the term "exclusions hereunder" to refer more broadly to all exclusions under the Treaty, including those in Article II(1)(B). Such a construction would have been permissible, and perhaps even the more persuasive. The panel majority's reading is certainly not the only colorable one. But the Award's embrace of that construction, and its rejection of Yosemite's contrary reading, was well within its authority to construe the Treaty.

Accordingly, after careful consideration, the Court holds that the Award reflects neither manifest disregard of the law nor an instance "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). Yosemite's claim of "irrationality" thus fails to supply a basis for vacatur.

### B. Partiality

The Court turns next to Yosemite's challenge to arbitrator Huszagh.

Under the FAA, a reviewing court may vacate an arbitral award "where there was evident partiality or corruption in the arbitrators." *See Applied Indus. Materials Corp. v. Ovalar Makine*

12

*Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 136 (2d Cir. 2007). "Evident partiality may be found only where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 64 (2d Cir. 2012) (internal quotation marks omitted). "The burden of proving evident partiality rests upon the party asserting bias," and that party may not meet its burden with "a showing . . . based simply on speculation." *Id.* at 72 (internal quotation marks omitted).

To determine whether a party asserting evident partiality has met its burden, "the court employs a case-by-case approach in preference to dogmatic rigidity." *Id.* (internal quotation marks and alteration omitted). The Second Circuit has deemed "helpful" a test for evident partiality adopted by the Fourth Circuit, in which courts examine

> "(1) the extent and character of the personal interest, pecuniary or otherwise, of the arbitrator in the proceedings; (2) the directness of the relationship between the arbitrator and the party he is alleged to favor; (3) the connection of that relationship to the arbitrator; and (4) the proximity in time between the relationship and the arbitration proceeding."

*Id.* at 74 (quoting *Three S Del., Inc. v. DataQuick Info. Sys., Inc.*, 492 F.3d 520, 530 (4th Cir. 2007)).

Here, Yosemite argues that Huszagh's service as a lawyer adverse to it in the Allstate Proceeding, and Huszagh's failure to disclose it prior to serving as an arbitrator in this case, gives rise to "a reasonable impression of partiality." Pet. at 6. In support, Yosemite notes that the contract at issue in the Allstate Proceeding contained language identical to the language that Huszagh construed while serving as an arbitrator in this case. *Id.* at 4–5.

Nationwide counters that Yosemite has come forward with sparse information about the Allstate Proceeding. And, it argues, the facts adduced do not suggest partiality: The Allstate Proceeding (which involved asbestos bodily injury, not environmental, claims) was unrelated to

13

the current dispute between Yosemite and Nationwide; it settled and did not apparently require the panel to resolve the parties' dispute; and Huszagh's involvement in it was perforce limited. Further, Nationwide notes, the Allstate Proceeding took place "more than a decade ago," such that Huszagh's failure to recall it should not give rise to an inference of deliberate non-disclosure misconduct; rather, Nationwide states, it was "very likely simply forgotten" by Huszagh, much as it was forgotten by McDonnell. *Id.*

Importantly, Huszagh's failure to disclose his involvement in the Allstate Proceeding does not itself establish partiality to warrant vacatur. To demonstrate "evident partiality" under the FAA, Yosemite must also show that "the *facts* that were not disclosed suggest a material conflict of interest." *See Scandinavian Reinsurance Co.*, 668 F.3d at 77 (emphasis in original); *see also Nat'l Indem. Co. v. IRB Brasil Resseguros S.A.*, 164 F. Supp. 3d 457, 476 (S.D.N.Y. 2016) ("[T]he materiality of the undisclosed conflict drives a finding of evident partiality, not the failure to disclose or investigate *per se*.").

Here, the sparse information that Yosemite has mustered about the Allstate Proceeding falls far short of meeting that standard. Indeed, none of the four factors in the test the Second Circuit has found helpful support Yosemite's claim of evident partiality.

As to the first factor, Huszagh's interest in this proceeding, there is no non-speculative basis for asserting any such interest. His service as counsel a decade ago for an insurance company in litigation with Yosemite would not give him any stake, pecuniary or otherwise, in the resolution of a dispute between a different insurance company and Allstate. As to the second and third factors, bearing on the relationship between Huszagh and the party he is claimed to favor, Yosemite offers no evidence of *any* relationship between Huszagh and Nationwide. Even if these factors are broadened to consider the relationship between Huszagh and the party he is

14

claimed to disfavor, the facts adduced—that Huszagh a decade ago served as litigation counsel to a party adverse to Yosemite in an arbitration that settled—without more, would not signify antipathy, let alone enduring antipathy, to Yosemite. Nor would the nature of the Allstate Proceeding give rise to such an inference. Yosemite has not shown that the issues there prefigured those here, so as even arguably to predispose an advocate towards a like outcome in a later case. Yosemite instead has adduced two letters reflecting Huszagh's involvement in the Allstate Proceeding, both addressed to Huszagh and bearing the subject line "Arbitration Between Yosemite Ins. Co. and Allstate Ins. Co." Mulloy Aff., Ex. 11–12. But neither reveals the nature of the arbitrated dispute, or of Huszagh's participation. And, insofar as the second letter references "the Amcord claim," and a "Claim Letter Summary" for that claim states that the claim involved asbestos bodily injury, it suggests that the issues at hand were different from those here. *Id.*, Ex. 13. That the reinsurance contract in that case contained an identically-worded contamination and pollution exclusion, Dkt. 1–1 at 83–86—a point that Yosemite emphasizes—does not signify that the language of that exclusion was at issue in the Allstate Proceeding. As to the fourth factor, the proximity in time between the relationship and the arbitral proceeding, Huszagh's legal work for a party then adverse to Yosemite occurred 10 years ago, in a case that long ago settled. There is no evidence of any continuing nexus, even attenuated, between him and Yosemite.

Yosemite, finally, relies on inapposite cases. *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145 (1968), is indicative. There, the party seeking to prove bias came forward with evidence of the arbitrator's "repeated and significant" business dealings with a party. *Id.* at 145. Yosemite makes no such claim and has no such evidence.

The Court, therefore, rejects Yosemite's claim of partiality.

15

Having rejected both of Yosemite's challenges to the Award, the Court denies its petition to vacate and grants Nationwide's cross-petition to confirm the Award.

### C.     Fees and Costs

Nationwide asks the Court to order Yosemite to pay Nationwide's attorneys' fees and costs in this proceeding, arguing that the Petition is frivolous and was brought in bad faith. Nat. Mem. at 26–27.

Federal courts may award attorneys' fees "in the exercise of their equitable powers . . . when the interests of justice so require." *Hall*, 412 U.S. at 4–5. "[T]o impose sanctions pursuant to its inherent power, a district court must find that: (1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, i.e., motivated by improper purposes such as harassment or delay." *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999). Federal courts may also award fees and costs pursuant to 28 U.S. C. § 1927, when an attorney "multiplies the proceedings in any case unreasonably and vexatiously." Such sanctions, whether sought under § 1927 or pursuant to the Court's inherent power, require a showing of bad faith. *Emmon v. Prospect Capital Corp.*, 675 F.3d 138, 143 (2d Cir. 2012). "[T]he only meaningful difference between [the two types of sanctions] is . . . that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." *Id.*

The Court here declines to award fees and costs because Yosemite's Petition was not frivolous. Yosemite's attacks on the Award and on arbitrator Huszagh's partiality, while not meritorious, were not objectively unreasonable or lacking in a "colorable basis" so as to merit sanctions. *See Schlaifer, Nance & Co.*, 194 F.3d at 336. The Court does, however, encourage

16

counsel, before bringing any future petition to vacate an arbitral warrant, to give more studied attention to the demanding showing necessary to obtain such relief.

## CONCLUSION

For the foregoing reasons, the Court denies Yosemite's Petition to vacate the Award, grants Nationwide's Cross-Petition to confirm the Award, and denies Nationwide's request for fees and costs. The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

_____
Paul A. Engelmayer
United States District Judge

Dated: November 7, 2016
       New York, New York